## A. A. WILLIAMS *v.* W. F. TALBOT.

The redhibitory action cannot be maintained when the purchaser of a slave permitted many months to elapse, after the first development of disease, without resorting to medical aid.

APPEAL from the Second District Court of New Orleans, *Morgan*, J.
*R. & H. Marr*, for plaintiff and appellant. *Moise & Randolph*, for defendant.

COLE, J. This is an action to rescind the sale of a slave, passed the 1st January, 1853, and to recover the price, on the ground that he was afflicted at

that time with a redhibitory malady, which caused his death about the middle of June, 1854.

It is alleged that this disease was pulmonary consumption.

*Davis* was the overseer of plaintiff during the time the slave *Jack* was on his plantation, and testifies that he was apparently well at his arrival, but two or three weeks afterwards, witness discovered he was affected with a bad cough, particularly of nights; his health became gradually worse to the period of his decease.

He first noticed, in July or August, 1853, that *Jack* expectorated blood during his spells of coughing, and complained of fever and night sweats. He was employed at chopping wood up to the middle of October, 1853.

*Dr. Favrot* was first called to see him in July or August, 1853; he prescribed for him at that time, and afterwards in October of the same year.

*Dr. Vaughan* testifies he first examined *Jack* in December, 1853, and found him in an advanced stage of tubercular consumption.

*Drs. McKelvey* and *Picton* examined him in the spring of 1854, and the former testifies, he thinks, they found a cavity in one of the lobes of his lungs.

The neglect of plaintiff to send for medical aid for so many months after the first manifestation of symptoms of disease, constitutes, under the established jurisprudence of this court, a bar to his action of redhibition.

Plaintiff has sought to prove by scientific gentlemen, that the disease existed anterior to the sale; but the uncertainty which characterizes human speculations and hypothesis, renders such testimony nugatory, unless the witnesses had been called at the first opening of the malady, and had exerted their medical resources to a degree that they could reasonably testify the death did not result from neglect to apply scientific aid to the primary symptoms of disease.

He has also attempted to show that this slave was injured many years before the sale, and exhibited then some signs of the disease which subsequently terminated his existence; but evidence of this character cannot, as a general rule, prevail, unless a continuity of the malady is established from its inception to the death of the patient, with more or less violence; it may be, however, with brief periods of respite, according to the nature of the disease, and unless also within a reasonable time after the first signs of the disease medical assistance is invoked.

Even if it could be proved the malady was incurable *ab initio*, this would not be of itself sufficient to cancel a sale, for if a physician had been called at the primary manifestation of the disease, the life of the slave might have been extended for some years.

It would be unjust to coerce the vendor to return the price, when, if medical aid had been promptly summoned, the life of the slave might have been spared for years, and then even if he was obliged to take him back, he would have had the benefit of his services for a long period.

Humanity and a just regard to the rights of vendors require that parties should not recover, who have permitted many months to elapse, after the first development of disease, before invoking medical aid.

Vide 10 An. 263, 267, 302.

The judgment is therefore affirmed, with costs.